J-S40028-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
      v.      :
  :
  :
  :
HENRY O. MENDOZA   :
  :
      Appellant   :   No. 218 MDA 2025

Appeal from the Judgment of Sentence Entered January 9, 2025
In the Court of Common Pleas of Berks County
Criminal Division at No(s):  CP-06-CR-0002830-2023

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY PANELLA, P.J.E.:     **FILED: DECEMBER 29, 2025**

Henry O. Mendoza appeals from the judgment of sentence imposed on January 9, 2025, for his convictions arising from a shooting incident that occurred on June 11, 2023. Mendoza challenges both the sufficiency and weight of the evidence and argues the trial court abused its discretion in imposing sentence. After careful review, we affirm.

The trial court appropriately set forth the relevant factual and procedural history:

### Procedural History

The defendant in the above-captioned case, Henry Mendoza …, was charged with conspiracy to commit murder of the first degree (2 counts)[a], criminal attempt to commit murder of the first degree (2 counts)[b], conspiracy to commit aggravated assault (2 counts)[c], aggravated assault (2 counts)[d], conspiracy to commit aggravated assault with a deadly weapon (2 counts)[e], aggravated assault with a deadly weapon (2 counts)[f], and possession of a firearm by a minor[g] arising from an incident

alleged to have occurred on June 11, 2023. On November 20, 2024, a jury found [Mendoza] guilty of all thirteen (13) counts. On January 9, 2025, [Mendoza] was sentenced to an aggregate sentence of twenty (20) years to forty (40) years in a state correctional facility to run consecutive to a sentence of forty-five (45) years to life from Berks County Docket CP-06-CR[-]0002823-2023. On January 20, 2025, [Mendoza] filed a post-sentence motion which [the trial court] denied on January 27, 2025.

[a] 18 Pa.C.S.A. Sec. 903(a)(1) – 18 Pa.C.S.A. Sec. 2502(a)
[b] 18 Pa.C.S.A. Sec. 901(a) – 18 Pa.C.S.A. Sec. 2502(a)
[c] 18 Pa.C.S.A. Sec. 903(a)(1) – 18 Pa.C.S.A. Sec. 2702(a)(1)
[d] 18 Pa.C.S.A. Sec. 2702(a)(1)
[e] 18 Pa.C.S.A. Sec. 903(a)(1) – 18 Pa.C.S.A. Sec. 2702(a)(4)
[f] 18 Pa.C.S.A. Sec. 2702(a)([4])
[g] 18 Pa.C.S.A. Sec. 6110.1(a)

On February 10, 2025, [Mendoza] filed a notice of appeal to the Superior Court of Pennsylvania. On February 12, 2025, [Mendoza] was ordered to file a concise statement of matters complained of on appeal within 21 days from the order's entry on the docket. On February 25, 2025, [Mendoza] filed a concise statement of matters complained of on appeal.

[**Factual History**]

On June 11, 2023, around 11:30 p.m., Xavier Rivera … and Jaiden DeJesus … walked from their house to Turkey Hill to get cigarettes and fountain drinks. When they first entered the Turkey Hill, Rivera noticed an African American man that he had never seen before, Bonef Hassel[,] … paying at the cash register[,] and the cashier, but no one else in the store. Rivera then went to get drinks for DeJesus and himself and told DeJesus to get whatever snacks he felt like. While he was grabbing drinks, Rivera heard DeJesus say something to Hassel. Rivera corrected DeJesus, apologized to Hassel, and told DeJesus to hurry up so they could grab their stuff and leave. After they had grabbed their snacks and drinks, DeJesus noticed Hassel standing at the door staring at them and said something again. Rivera corrected DeJesus again and Hassel left the store. Once Rivera had paid for the snacks and

drinks, both he and DeJesus left Turkey Hill and began their walk home.

After Hassel left the Turkey Hill, he got into his car, a black four-door sedan, and FaceTimed [Mendoza] to see if he knew DeJesus. Hassel wanted to ask if [Mendoza] knew DeJesus because he wanted to know if DeJesus staring at him was a threat or not. Hassel got out of his car and pointed the camera of the phone into the Turkey Hill to show DeJesus to [Mendoza]. The Turkey Hill had cameras pointed at the parking lot and the pumps which showed Hassel get out of his car, remove a gun from his waistband and move it to his pocket, and then walk towards the front of the Turkey Hill while on FaceTime with [Mendoza]. Hassel disappears from the view of the camera for nine (9) seconds while he was near the door, before moving back to his vehicle, still on FaceTime with [Mendoza]. [Mendoza] said he did not know DeJesus or Rivera, but told Hassel to come and get him so that he could go back to the Turkey Hill to see if he recognizes DeJesus. The video from the Turkey Hill camera shows Hassel getting into his car, pulling out of the parking spot he was in, and leaving the Turkey Hill. Hassel then drove to [Mendoza's] house to pick him up in order to bring him back to the Turkey Hill.

Hassel had dated [Mendoza's] mother, Denise Vasquez, from 2012 to 2018. [Mendoza] was twelve (12) when Hassel met him. Hassel lived with [Mendoza] and his family throughout the duration of his relationship with [Mendoza's] mother. However, even when the relationship ended between Hassel and [Mendoza's] mother, Hassel remained close with [Mendoza] until June 11, 2023, the day of the shooting. Hassel and [Mendoza] would speak on the phone, as well as see each other regularly. Hassel picked [Mendoza] up from his house, 1017 Greenwich Street, where he had lived since 2019. Hassel would go there regularly; however he would always call [Mendoza's] mother when he was coming over to see [Mendoza]. When Hassel arrived at [Mendoza's] home, [Mendoza] was already outside waiting for him. Before [Mendoza] got into Hassel's car, Hassel told him "Do not shoot out of my car." Hassel had previously seen [Mendoza] with a black nine-millimeter Taurus, but did not see the gun on him this night. Hassel did not think [Mendoza] had a gun on him when he picked him up because he told him not to shoot out of the car. [Mendoza] got right into Hassel's car when he arrived and within a couple seconds they were driving back towards the Turkey Hill.

While Hassel was driving [Mendoza] back to the Turkey Hill, he noticed Rivera and DeJesus walking on the opposite side of the street, so he made a U-turn and pulled up beside them at the intersection of 13th and Green Street. DeJesus noticed Hassel's vehicle pull up next to them. Hassel was driving the vehicle, and [Mendoza] was sitting in the passenger seat. Hassel said, "Are ya good?" out the window and DeJesus went over towards the car and spoke with Hassel. Rivera then saw Hassel reaching down towards his foot where the gas pedal would be. At trial, Rivera testified that he saw Hassel lift his hand and saw a gun in it, he pushed DeJesus out of the way and was subsequently hit in the chest with a bullet. However, when he was interviewed in the hospital by Criminal Investigator Steve Valdez … the day after the shooting, he testified that he did not know whether the driver, Hassel, shot his gun but did know that the passenger, [Mendoza], fired his gun. Following being shot in the chest, Rivera saw [Mendoza] shoot out the passenger window, about five (5) or six (6) times in the direction of DeJesus.

Once [Mendoza] stopped shooting, Hassel drove the vehicle away and both Rivera and DeJesus ran. After driving away, Hassel took [Mendoza] back to his house, dropped him off and then went back to his own house. Once Hassel was home, [Mendoza] called him, and they spoke on the phone for about an hour.

After running for a short while, Rivera was able to get DeJesus to stop, and they were able to get help and an ambulance was called. Officer Jason Zagorski …, a patrol officer for the City of Reading Police Department, was called to the scene of the shooting. When Officer Zagorski arrived at the scene, he saw both Rivera and DeJesus with gunshot wounds. Both Rivera and DeJesus were later transported to Reading Hospital to be treated for their injuries.

As stipulated to by the Commonwealth and [Mendoza], Rivera was shot in the left side of his chest, through the nipple, with the bullet going completely through his body and exiting from the left side of his back. As a result of this gunshot wound, Rivera's left lung was damaged, causing a significant collection of blood to accumulate in the left lung. If this had been left untreated, Rivera would not have been able to breathe and would have needed surgery to repair the lung and prevent further injury. "The injuries sustained by Xavier Rivera were the kind of injuries that would

create a substantial risk of death, or cause serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

As stipulated to by the Commonwealth and [Mendoza], DeJesus was shot three (3) times, once in the right cheek, once in the right side of his neck, and once in his right thigh. The gunshot wound to his right cheek shattered his jawbone and required surgery to repair. The gunshot wound to his neck caused a submandibular hemorrhage to the salivary glands which usually requires long-term follow up care with a specialist. The gunshot wound to DeJesus' right thigh … did not cause significant injury to his femur bone or to his femoral artery, however, due to its proximity to the femoral artery the bullet could not be removed. The injuries to DeJesus' face and neck were significant and required surgery and significant long-term care. "The injuries sustained by Jaiden DeJesus were the kind of injuries that would create a substantial risk of death, or cause serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

While Rivera and DeJesus were in the hospital C.I. Valdez interviewed them both. On June 12, 2023, during his interview with Rivera, C.I. Valdez did a photo line-up with individuals that resembled Hassel. Rivera circled and initialed the photo of the individual that he had seen at the scene of the shooting, the photo Rivera marked was the photo of Hassel. On June 13, 2023, during his interview with DeJesus, C.I. Valdez also showed him a photo line-up with individuals that resembled Hassel, and DeJesus also circled and identified the photo of Hassel. At trial, C.I. Valdez testified that DeJesus had been subpoenaed to testify at trial, but unlike Rivera, he refused to submit to the subpoena and did not appear for court.

Based on the interviews with both Rivera and DeJesus, C.I. Valdez filed charges against Hassel, and he was taken into custody by the United States Marshals on June 15, 2023. Once Hassel was in custody, C.I. Valdez interviewed him, and through this interview was able to develop [Mendoza] as a suspect in the shooting and filed charges against him.

In the course of the investigation, the Reading Police Department obtained a search warrant for [Mendoza's] residence. During the search of [Mendoza's] residence, Criminal Investigator Katelyn

Super … was asked to search the basement. During her search of the basement, C.I. Super found a firearm hidden inside a cooler. Upon finding the firearm, C.I. Super alerted the Criminal Investigations Unit, and it was taken into possession. The firearm was then sent to the Berks County Forensics Unit, along with casings recovered from the scene where the shooting took place, to see if the casings were fired from the gun found in [Mendoza's] home. Dr. Jessica Kennedy …, a forensic scientist at Berks County Forensics Services Unit examined the casings along with the firearm and was able to determine that the casings found at the scene were fired from the gun found in [Mendoza's] basement.

Trial Court Opinion, 3/31/25, at 1-7 (record citations and unnecessary capitalization omitted).[1]

Mendoza raises three issues for our review:

I. Should this Court grant a new [t]rial in this matter where the Commonwealth failed to produce sufficient evidence?

II. Should this Court grant a new [t]rial in this matter where the verdict was against the weight of the evidence?

III. Should this Court grant a new sentencing in this matter where the [s]entencing [c]ourt abused its discretion by considering a [p]revious juvenile aggravated assault charge which was expunged during sentencing?

Appellant's Brief, at 4 (trial court answers omitted).

In his first claim, Mendoza argues the evidence was insufficient to identify him as the shooter. *See id.* at 8-9. Mendoza admits his testifying co-defendant, Hassel, identified him as the shooter but asserts Hassel's testimony was not credible. *See id.* He further alleges the cell phone tower data relied

---

[1] We commend the trial judge, the Honorable M. Theresa Johnson, for the comprehensive and well-written Memorandum Opinion dated March 31, 2025.

upon by the Commonwealth was insufficient as it only placed him near the crime scene and cannot place a firearm in his hands. ***See id.*** at 9-11. We disagree.

> Our standard of review regarding sufficiency claims is as follows:
>
> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

***Commonwealth v. Smith***, 206 A.3d 551, 557 (Pa. Super. 2019) (brackets and citations omitted)

As Mendoza has solely challenged his identity as the shooter, we further note:

> [I]n addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes. It is well-settled that evidence of identity need not be positive and certain to sustain a conviction. Even if the Commonwealth presented only circumstantial evidence and offered no positive identification of the perpetrator, we may not weigh the evidence and substitute our judgment for the fact-finder as long as the evidence was sufficient to prove the accused's guilt.

*Commonwealth v. Torsunov*, 345 A.3d 339, 347-48 (Pa. Super. 2025) (brackets, quotation marks, and citations omitted). Likewise, "any indefiniteness and uncertainty in the identification testimony goes to its weight." *Commonwealth v. Strafford*, 194 A.3d 168, 175-76 (Pa. Super. 2018) (citation omitted).

As the evidence was clearly sufficient to identify Mendoza as the shooter, Mendoza's claim therefore goes to the weight of the evidence and not the sufficiency of the evidence presented at trial. However, we find the trial court's detailed opinion addressing why the evidence was sufficient to identify Mendoza as the perpetrator of these crimes persuasive. The trial court explained:

> The testimony presented by Hassel is not uncorroborated. During trial, the Commonwealth presented both video evidence and cell location technology to place [Mendoza] at the scene of the shooting. Data was also collected that showed that [Mendoza] called Hassel, as Hassel testified, at 11:31:35 p.m., after the shooting happened and the call lasted almost 2 hours. Further, the jury is the finder of fact, and therefore is able to make the determination as to whether or not they choose to believe a witness' testimony. In the case at bar, the jury chose to believe Hassel's testimony regarding [Mendoza] and found [Mendoza] guilty.
>
> The Commonwealth presented as evidence a video recording of the shooting at 13th [and] Green [streets] from a southwest vantage point. In the recording Hassel's vehicle is seen pulling up to where Rivera and DeJesus are on the sidewalk, and within ten (10) seconds shots are fired from the passenger window and the car drives away. This video corroborates the testimony given by Hassel during trial, that as he was driving [Mendoza] back to the Turkey Hill, he saw Rivera and DeJesus walking, subsequently

made a U-turn and pulled his car up next to them and after a few seconds shots were fired from the vehicle.

In addition to the video evidence and cell location technology placing [Mendoza] at the scene of the shooting, Hassel participated in a consensual phone call during his interview with C.I. Valdez, which was recorded and parts of which were played for the jury. Hassel called [Mendoza's] phone number and [Mendoza] answered. During this consensual phone call, Hassel referenced June 11, 2023, multiple times. The call lasted about twenty (20) minutes. During the phone call Hassel says to [Mendoza] that he needs to get rid of his "hammer" because his "hammer" was the one that shot Rivera and DeJesus. According to C.I. Valdez, the term "hammer" in the context of a criminal investigation typically means firearm. During the ensuing investigation the firearm used in the shooting was found hidden in the basement of [Mendoza's] home and later confirmed to be the gun that fired the casings that were found at the scene of the shooting. Hassel also asked [Mendoza] during the phone call "did you find out … did they die or something?" referencing Rivera and DeJesus, to which [Mendoza] responded "No."

The Commonwealth presented as evidence the video recording of [Mendoza's] interview at the police station, portions of which were shown to the jury. The interview was with C.I. Valdez and Detective Bradley Silcox …, during which [Mendoza] attempted to provide the police with an alibi for the time of the shooting. [Mendoza] claimed he was with a female in Exeter during the time of the shooting. However, [Mendoza] refused to give the female's name or address to the police to confirm that he was there.

Further, [Mendoza] claims that Hassel had his own motive in testifying against him, however, at the time of the trial, Hassel had not been promised anything as far as a withdrawal of charges or a reduction of sentence in exchange for his cooperation. Hassel testified that his motivation for cooperating was to prove he did not commit this crime, show concern for the victims, as well as hopefully get some help with his case. However, as previously stated, there were no promises or deals made with Hassel in exchange for his cooperation at trial.

Based on all the testimony and evidence presented by the Commonwealth which corroborated Hassel's testimony, the jury

chose to believe Hassel and found [Mendoza] guilty. Therefore, [Mendoza] is not entitled to relief.

Trial Court Opinion, 3/31/25, 13-15 (record citations omitted).

As stated above, our review confirms the evidence presented at trial was more than sufficient to establish Mendoza as the shooter. Hassel testified that he picked up Mendoza and was driving to the Turkey Hill when he saw Rivera and DeJesus, so he turned around and pulled up next to them. *See* N.T. Trial, 11/19/24, at 140-144. Within seconds, shots were fired. *See id.* at 145. Hassel testified that Mendoza shot at both Rivera and DeJesus. *See id.* at 150-152. Bullet casings found at the scene of the shooting matched the firearm found hidden in Mendoza's basement. *See id.* at 261. As such, Mendoza's first issue is meritless.

Furthermore, in his next issue, Mendoza asserts the verdict is against the weight of the evidence. He again asserts Hassel's testimony should not be believed as he is a "corrupt and polluted source[.]" Appellant's Brief, at 13. He argues the cell phone location data and firearm found in his basement do not tip the scales enough for a conviction. *See id.*

In contrast to a sufficiency claim, a weight of the evidence claim is addressed to the sound discretion of the trial court. *See Commonwealth v. Dortch*, 343 A.3d 298, 306 (Pa. Super. 2025). This Court has explained:

> Where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review

- 10 -

> is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.
>
> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained, the term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

***Id.*** (citations omitted).

Here, the trial court relied upon its analysis of the sufficiency of the

evidence to hold:

> the verdict was not contrary to the evidence as the jury was presented with a case upon which to convict [Mendoza]. The jury evaluated the evidence, determined the credibility of the witnesses and, when assessing the weight of the evidence, believed the evidence presented by the Commonwealth and rendered a guilty verdict. Therefore, the verdicts were consistent with the evidence presented and did not shock anyone's sense of justice.

Trial Court Opinion, 3/31/25, at 20.

For the same reasons as we found Mendoza's sufficiency claim without merit, we find the trial court clearly did not abuse its discretion in denying Mendoza's weight of the evidence claim. Therefore, Mendoza's second issue does not merit relief.

Finally, Mendoza argues the trial court erred in considering expunged juvenile charges prior to issuing its sentence. **See** Appellant's Brief, at 18. He further claims running this sentence consecutive to another, unrelated conviction, was an abuse of the trial court's discretion. **See id.**

Mendoza concedes these claims challenge the discretionary aspects of the sentence imposed. **See id.** at 16. Such a challenge does not entitle an appellant to an appeal as of right. **See Dortch**, 343 A.3d at 310.

> Where an appellant challenges the discretionary aspects of his sentence, as is the case here, the right to appellate review is not absolute. On the contrary, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying the following four-part test:
>
>> (1) whether the appeal is timely; (2) whether appellant preserved his issue; (3) whether appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

**Id.** (citations omitted).

Mendoza filed a timely notice of appeal and preserved his issue in a post-sentence motion. However, he has not included in his brief a concise statement as required by Rule 2119(f) and the Commonwealth has objected

to this omission. ***See*** Appellee's Brief, at 21. Because the Commonwealth has objected, we are precluded from reviewing the merits of this issue. ***See Commonwealth v. Kiesel***, 854 A.2d 530, 533 (Pa. Super. 2004) (holding that where an appellee does not object to the failure to include a Rule 2119(f) statement, we may review the claim but "this option is lost if the appellee objects to a [Rule] 2119(f) omission. In such circumstances, this Court is precluded from reviewing the merits of the claim and the appeal must be denied.") (citations omitted).

We note that even if the Commonwealth did not object, this claim would be meritless.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. Appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Dortch***, 343 A.3d at 310 (quotation marks and citations omitted). "Moreover, we note the imposition of consecutive rather than concurrent sentences lies within the sound discretion of the sentencing court." ***Commonwealth v. Taylor***, 277 A.3d 577, 593 (Pa. Super. 2022) (citation and internal quotation marks omitted).

As noted above, Mendoza argues the trial court erred in considering a prior juvenile record that was expunged and that the sentence should have

been run concurrent with another, unrelated, sentence. *See* Appellant's Brief, at 18.

Prior to imposing the sentence, the trial court thoughtfully detailed its sentencing decision:

> In coming up with a sentence, [the court has] considered the sentencing factors under Title 42, subsection 9721(b). [The court has] considered the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, the rehabilitative needs of the defendant, the factors in favor of probation and the basis for total confinement.
>
> [The court] believe[s] what is so troubling about this case, amongst many things, is the fact that Mr. Mendoza was not even in the Turkey Hill. Mr. Mendoza had no contact with the victims in this case. He's at home. He gets picked up by the codefendant and these victims are in the wrong place at the wrong time in that they are right on the sidewalk where the car pulls up, and it appears from the video that the window comes down, and, either they are called over to come closer or they walk over [] wondering who is in the car and they are shot at multiple times at close range.
>
> It's just difficult to comprehend when you have no connection with the two victims what it takes to just open fire on two unsuspecting innocent people that are walking along the sidewalk. I think that you're dangerous. I am not considering, as counsel pointed out, your juvenile adjudications or that Consent Decree, although, I've looked at the PSI. I'm not considering—I know there is another case in front of me, the facts of which, unless I sit here and read it, I am not familiar with them. I can see that it is an aggravated assault, but I am not even familiar with the facts unless I would read the Probable Cause of which I'm not doing because I am not even taking that into consideration.
>
> I am taking into consideration specifically what you did on this night, which was attempt to murder two people who are just walking along the sidewalk. To my knowledge you don't even know these people. I believe the codefendant testified that he held up the phone, face-timed you and asked did you know who these

- 14 -

people were. And for whatever reason, you get in a car and just attempt to kill them. I think you're dangerous.

N.T. Sentencing, 1/9/25, at 15-16.[2]

Upon review of the record, we cannot find an abuse of discretion. The trial court specifically stated it would not consider the prior expunged record that Mendoza is now claiming was considered. Mendoza has not pointed us to, nor can we find any, evidence that the trial court did, in fact, consider the expunged record. Furthermore, as the trial court aptly noted, Mendoza "is not entitled to a volume discount for his crimes." *Commonwealth v. Swope*, 123 A.3d 333, 341 (Pa. Super. 2015) (citation omitted); *see* Trial Court Opinion, 3/31/25, at 26. Therefore, even if not waived, this issue does not merit relief.

_____

[2] We note there is typographical error on the cover page of the transcript for sentencing stating it occurred on January 9, 2024. However, as no party disputes the date of sentencing and it is clear sentencing was held on January 9, 2025, we have utilized the correct date when we refer to the transcript.

Because Mendoza's claims are all meritless, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/29/2025